IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHARLES BOMMICINO,

      Plaintiff,

v.

GENERAL MOTORS, LLC f/k/a
GENERAL MOTORS CORP., UNITED
AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA, LOCAL 10, et al.,

      Defendants.

CIVIL ACTION NO.

1:10-cv-2400-JEC

**ORDER AND OPINION**

This case is presently before the Court on defendant General Motors, LLC's ("General Motors") Motion for Summary Judgment [53] and defendant United Automobile, Aerospace & Agricultural Implement Workers of America, Local 10's (the "Union" or "Local 10") Motion for Summary Judgment [56]. The Court has reviewed the record and the arguments of the parties and, for the reasons that follow, concludes that defendant General Motors' Motion for Summary Judgment [53] is **GRANTED** and the Union's Motion for Summary Judgment [56] is **GRANTED**.

**BACKGROUND**

I. **PLAINTIFF'S EMPLOYMENT AND TERMINATION**

Plaintiff Charles Bommicino was an hourly employee of defendant General Motors and worked as a forklift mechanic at the Doraville, Georgia assembly plant. (Def. General Motors Statement of Material Facts ("GMSMF") [53] at ¶ 1.) Plaintiff was also a member of the local chapter of the UAW: defendant Local 10. (Union's Statement of Material Facts [56] at ¶ 1.) In approximately November 2005, General Motors announced it was closing the Doraville assembly plant, along with four other facilities. (GMSMF [53] at ¶ 3.) In connection with the plant closure, General Motors offered a "Special Attrition Program" ("SAP") to hourly employees at Doraville in 2008. (*Id.* at ¶ 4.) The 2008 SAP was a collectively bargained agreement ("CBA") between General Motors and the UAW consisting of enhanced benefits upon termination of employment available to UAW members on a voluntary basis. (*Id.* at ¶ 5.)

Under the 2008 SAP, employees could select one of four options under which they could either retire or quit in exchange for enhanced retirement benefits and/or a lump sum settlement. (*Id.* at ¶ 7.) Plaintiff signed up for the SAP on May 22, 2008, electing to retire under "Option 1" on October 1, 2008 with certain retirement benefits, subject to benefit plan terms, and a lump sum payment of $62,500.00. (*Id.* at ¶ 9.) In order to receive this option, the SAP provides that

2

the employee "must meet all eligibility conditions of the Option in order to receive it." (Form A, p. 2 of SAP, attached to Pl.'s Dep. [57] at Ex. 1.) General Motors indicates that plaintiff's active employment on the designated date of separation was a prerequisite to obtaining "Option 1" benefits under the SAP. (Hunter Decl. [53] at ¶ 4.) Unfortunately for plaintiff, General Motors terminated him prior to the October 1 effective date of his retirement.

Specifically, weeks before plaintiff agreed to retire under the SAP, Beth Zefo, a labor relations supervisor at General Motors, began investigating a report that plaintiff was leaving the plant during work hours and having another employee swipe his badge at the end of the shift in order to clock him out. (GMSMF [53] at ¶ 10; Zefo Dep. [64] at 36-37.)[1] As part of its investigation, General Motors arranged for investigators from a third-party security service to

---

[1] Plaintiff's assertion that he lacks personal knowledge of the inner workings of General Motors' management and cannot state with certainty the truth of the asserted fact does not prohibit a finding that defendant General Motors' offered fact is undisputed. The Local Rules of this Court provide that "[t]he response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Fed. R. Civ. P. 56(d)." LR 56.1(B)(2)(a)(4), NDGa. Federal Rule of Civil Procedure 56(f) has been recast as Rule 56(d) since the 2010 amendments went into effect and "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)." Notes of Advisory Committee on 2010 Amendments. In any event, plaintiff has not shown "by affidavit or declaration that, <u>for specified reasons</u>, [he] cannot present facts essential to justify [his] opposition." FED. R. CIV. P. 56(d)(emphasis added).

follow plaintiff and record surveillance video if he left the plant during work hours. (GMSMF [53] at ¶ 11.) In addition, General Motors' management assembled time clock and swipe history reports for plaintiff to determine where in the plant this other employee was clocking plaintiff out at the end of his shift. (*Id.*)

Following General Motors' investigation, Zefo and Jim Brassfield, Labor Relations Representative, conducted a disciplinary interview with plaintiff on June 26, 2008, pursuant to Paragraph 76(a) of the "National Agreement." (*Id.* at ¶ 12.) The National Agreement is a collectively bargained agreement between the national UAW, defendant Union, and General Motors, that governs the terms and conditions of plaintiff's employment. (*Id.* at ¶ 2.) Plaintiff's union representative, Shop Chairman Claude Willis, was also present at this interview. (*Id.* at ¶ 12.) At this interview, Zefo presented plaintiff with the results of her investigation.

Plaintiff was charged with leaving the plant while clocked in and having another employee cover for his unauthorized departure by swiping plaintiff's badge at the end of the shift. (GMSMF [53] at ¶ 13.) In essence, plaintiff was accused of stealing from General Motors by accepting pay for hours he did not work. To support this charge, Zefo listed dates, times, and column locations of the time clock where the badge was swiped, while plaintiff's vehicle was observed away from the plant. (*Id.*) Zefo also informed plaintiff

that, on May 20, 2008, she personally witnessed another employee swipe plaintiff's badge at 6:08 PM, while plaintiff (or at least his vehicle) was observed away from the plant. (*Id.* at ¶ 17.) She compared the 6:08 PM swipe time from the same station and confirmed that plaintiff's badge had been swiped at 6:08 PM and no other badges had been swiped at that station around the same time. (*Id.*)

Defendant denies that he was ever seen away from the plant while he was clocked in, and attributes his perceived absenteeism to the fact that investigators failed to realize that plaintiff owns several vehicles and takes different vehicles to and from work. (Resp. to GMSMF [65] at ¶¶ 13, 17.) He said that he would go home for lunch and return with a different vehicle, which might leave the impression he was still at home. (GMSMF [53] at ¶ 18.) Although not mentioned in the 76(a) interview, plaintiff later stated that his supervisor allowed him to combine his lunch and break periods, which allowed him to be away from the plant for up to an hour and fifteen minutes. (*Id.* at ¶ 19.)

Plaintiff was asked during the interview to produce his employee badge and asked if he had any other badges in his possession. (*Id.* at ¶ 21.) Plaintiff turned over two badges: his own and the badge of Larry Grogan, a former General Motors employee. (*Id.*) Even though General Motors requires employees to turn in badges when their employment ends, plaintiff stated that Mr. Grogan gave him the badge

as a "souvenir" when Mr. Grogan retired the year before. (*Id.* at ¶ 21.) Zefo believes that plaintiff may have been using Mr. Grogan's badge to enter and exit the security gate without his own badge. (Zefo Dep. [64] at 103-104.) Employees were not required to swipe their badges to enter many of the gates; rather, they merely needed to flash their badges to security. (*Id.* at 103-104; Willis Dep. [63] at 49-51.) Thus, plaintiff could exit the plant while another employee kept plaintiff's actual ID badge so as to later swipe that badge and make it appear that plaintiff had left at a later time than he, in fact, departed.

At the close of the 76(a) interview on June 26, 2008, General Motors notified plaintiff that he was being discharged immediately for misconduct based on all the allegations set forth by management during the interview. (GMSMF [53] at ¶ 22.) Because plaintiff failed to remain employed until the effective date of his retirement, General Motors took the position that he was no longer eligible for retirement benefits or the lump sum payments under the 2008 SAP. (Hunter Decl. [53] at ¶ 4.)

On the same day as plaintiff's 76(a) interview, Zefo, Brassfield, Willis, and Committeeman Craig Yates attended a 76(a) interview with Stanislaw Kulpa. (GMSMF [53] at ¶ 26.) Zefo informed Kulpa that she personally observed him swipe plaintiff's badge on May 20, 2008, but Kulpa denied the allegations. (*Id.*) Following the

6

interview, defendant General Motors terminated Kulpa's employment. (*Id.*)

## II.  <u>PLAINTIFF'S GRIEVANCE & SETTLEMENT NEGOTIATIONS</u>

Immediately after plaintiff received his discharge paperwork, union representative Willis submitted a grievance to management on behalf of plaintiff, contesting his termination as unjust. (GMSMF [53] at ¶ 24.)  Zefo denied the grievance immediately. (Zefo Dep. [64] at 113.)  Thereafter, Union representatives attempted to gather information related to the allegations against plaintiff from other employees in his department. (GMSMF [53] at ¶ 27.)

Willis was unable to gather any additional information, and he requested a meeting with Zefo and Personnel Director Steve Hunter to discuss plaintiff's discharge grievance. (*Id.* at ¶ 28.)  Willis made specific arguments attacking General Motor's evidence against plaintiff and argued that the discharge was unjust given plaintiff's previously clean disciplinary record. (*Id.*)  Hunter encouraged Willis to withdraw plaintiff's grievance, but Willis declined to do so. (*Id.*)  Later in July, Zefo took Willis to the break room where she was located when she observed Kulpa swipe plaintiff's badge. (*Id.* at ¶ 29.)  Willis asked Zefo questions about where she was positioned in the break room and how she could see the time clock at which Kulpa swiped the badge. (GMSMF [53] at ¶ 29.)

The next day, in an effort to build a defense for plaintiff, Willis and the rest of the Shop Committee returned to the break room and reconstructed the scene as Zefo described. (*Id.* at ¶ 30.) The Shop Committee concluded that Zefo's version of events was credible, as she was in a position in which she could monitor the time clock and positively identify Kulpa. (*Id.*) Willis met with Hunter and Zefo again about plaintiff's grievance, and argued that plaintiff should be reinstated with full pay and benefits. (*Id.* at ¶ 31.)

On or about August 7, 2008, Willis met with Sam Kuper, Senior Labor Relations Manager, about plaintiff's discharge grievance and local management's unwillingness to negotiate any settlement involving reinstatement. (*Id.* at ¶ 32.) Willis and General Motors' management met on several more occasions in August to discuss their respective positions on settlement, with the union demanding reinstatement with full back pay, but with management denying the request. (GMSMF [53] at ¶ 33.) Around this same time, Willis tried to bolster plaintiff's defense by presenting management with an order awarding unemployment benefits in plaintiff's favor. (*Id.* at ¶ 34.)

On or about September 24, 2008, General Motors' management presented Willis with a settlement proposal for plaintiff's grievance by offering to classify plaintiff as "retired," effective October 1, 2008, rather than "discharged," thereby making plaintiff eligible for regular retirement benefits. (*Id.* at ¶ 35.) Willis countered that

8

plaintiff should also receive the SAP payment and back pay, but management rejected the demand. (*Id.* at ¶ 36.) Before accepting the settlement, Willis conferred with the union benefits representative and confirmed that plaintiff would lose health care and vested pension benefits if he rejected the settlement and if plaintiff's case was dismissed at any future steps of the grievance procedure. (*Id.* at ¶ 37.) Accordingly, against the estimated $90,000.00 in SAP money and back pay that plaintiff could gain if he prevailed on his grievance, Willis weighed the loss of pension, life insurance, and health care benefits that plaintiff would lose if his grievance were denied. (GMSMF [53] at ¶ 37.) Willis also considered his own experiences with the "umpire staff" and the unlikelihood of plaintiff's success in front of an umpire, given Zefo's credible eyewitness account. (*Id.* at ¶ 37.) After weighing all these factors, Willis agreed to General Motors' proposal and the settlement was finalized on September 24. (GMSMF [53] at ¶ 39.)

## III. <u>THE SETTLEMENT</u>

Sometime between September 24th and September 26th of 2008, Tony Lovely, UAW Zone Committeeman, notified plaintiff that his grievance had been settled. (Lovely Aff. [56] at ¶ 4; Pl.'s Dep. [57] at 98:2-4.) Plaintiff understood that the settlement meant his grievance was withdrawn. (Pl.'s Dep. [57] at 98:7-16.) Lovely also informed plaintiff that he could retire effective October 1st and should go to

the benefits representative to fill out the necessary paperwork to take his retirement. (*Id.* at 98:17-22, 99:1-7.) Plaintiff was also told that he would not receive back pay and would have to give up the $62,500 SAP bonus, but that he would have health insurance until he went on Medicare. (*Id.* at 99:11-13 and 14-17.) With regard to further appeal, Lovely told plaintiff that if he did not accept the settlement, he would "pretty much get nothing even if [he] appealed it" and that any appeal would be of "no avail." (*Id.* at 101:16-24.) After speaking with Lovely, plaintiff went to the Atlanta UAW office in October 2008 to complete his retirement paperwork. (GMSMF [53] at ¶ 42.) Plaintiff testified that he understood at this time that his grievance had been settled, and he began accepting retirement benefits shortly after submitting the paperwork. (*Id.*)

After his phone conversation with Lovely, plaintiff repeatedly sought written documentation of the settlement, but did not obtain it until April 5, 2010. (Pl.'s Aff. [66] at ¶ 40.) The Union Constitution governing the UAW and its members establishes a multi-step grievance procedure, which culminates in final and binding arbitration. (National Agreement, attached to Pl.'s Dep. [57] at Ex. 11, ¶¶ 28-55.) Plaintiff never filed an internal appeal of the Union's acceptance of the settlement offer.

## IV.   <u>THE PRESENT SUIT</u>

Plaintiff, along with Kulpa, filed suit against General Motors and the Union in the Superior Court of DeKalb County on June 15, 2010. Defendants removed to this Court on August 2, 2010. Plaintiff filed an amended complaint [17] containing nine counts.

Count I alleges that defendant General Motors breached the collective bargaining agreement, also known as the "National Agreement", that controlled General Motor's employment of Union members. Count II alleges that defendant General Motors breached the 2008 SAP by terminating plaintiff under false pretenses and refusing to pay benefits that were otherwise due. Count III alleges wrongful termination, and arises from the aforementioned CBA and plaintiff's discharge. Count IV alleges that the Union breached the National Agreement by failing to adequately represent plaintiff during his termination interview and through the grievance process. Plaintiff seeks monetary relief in the form of back pay, payment of the $62,500.00 SAP bonus, lost and future wages and benefits, punitive damages (Count VIII), and attorneys' fees (Count IX).[2]

The two defendants have moved separately for summary judgment, but the Court will treat their arguments as if they were raised

_____

[2]   Counts V, VI, and VII were brought on behalf of Kulpa, who filed a stipulation of dismissal without prejudice shortly after the filing of the amended complaint. (Stipulation [25] and Order of October 25, 2010 [30].)

11

jointly, unless otherwise noted.   Defendants' argument in favor of summary judgment is four-fold.   First, defendants contend that all of plaintiff's claims, which were purportedly brought under state law, are preempted.   To the extent that plaintiff's action may be recharacterized as arising under Section 301 of the Labor Management Relations Act, defendants argue that the action should be dismissed because plaintiff either filed his complaint outside the statute of limitations or failed to exhaust administrative remedies.   Finally, on the merits, the Union defendant contends that it did not breach any duties owed to plaintiff.

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(a).   The party seeking summary judgment bears the initial burden to show the district court, by reference to materials in the record, that there are no genuine issues of material fact that should be decided at trial.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If this initial burden is not satisfied, the motion must be denied and the court need not consider any showing made by the nonmovant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). If the movant satisfies this initial responsibility, the nonmoving

12

party then bears the burden to show the existence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

Where the movant bears the burden of proof on an issue, the movant "must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick*, 2 F.3d at 1115. Where the nonmovant bears the burden of proof, the moving party need only show the absence of evidence to support the nonmovant's case, or affirmative evidence demonstrating that the nonmovant will be unable to prove their case at trial. *Id.* at 1115-1116. The court must view all evidence and draw all reasonable inferences in favor of the nonmoving party. *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).

There is no "genuine" issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The substantive law will determine which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

13

II.   **PREEMPTION**

   A.   **Plaintiff's Claims are Preempted by Federal Law**

   Counts I, II, and III allege that defendant General Motors breached either the National Agreement or the SAP, both of which are collectively-bargained agreements.   Defendant General Motors therefore asserts that plaintiff's state law claims for breach of contract and wrongful termination are preempted by Section 301 of the Labor Management Relations Act.[3]   (GM's Br. [53] at 2-4.)   The Court agrees.

   By enacting Section 301 of the Labor Management Relations Act ("LMRA"), Congress intended for federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts.   *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985).   In determining whether Section 301 preempts a state law claim, a court must "consider whether the claim arises from a CBA[] or whether the resolution of the state-law claim depends upon the meaning of a collective bargaining-agreement."   *Atwater v. NFL Players Ass'n*, 626 F.3d 1170, 1176-77 (11th Cir. 2010)(citations omitted).   If the claim arises out of, or its merits depend on the meaning of a collective bargaining agreement, federal labor law applies.   *Id.*

_____

   [3]   The Union makes effectively the same argument, but does not use the term "preemption."

14

Plaintiff's claims based on alleged breaches of the National Agreement and SAP are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." *Bartholomew v. AGL Res., Inc.*, 361 F.3d 1333, 1338-39 (11th Cir. 2004)(holding that breach of contract claim under Georgia law would substantially depend upon an analysis of collective bargaining agreement and is preempted by § 301 of the LMRA). Plaintiff's claim for wrongful termination is also substantially dependent upon analysis of a CBA because "[i]n Georgia, wrongful termination is a tortious act growing out of the <u>breach of the employment contract</u>." *Fink v. Dodd*, 286 Ga. App. 363, 365 (2007)(emphasis added). *See Hood v. Sweetheart Cup Co., Inc.*, 816 F. Supp. 720, 723-25 (S.D. Ga. 1993)("claims of promissory estoppel and wrongful discharge clearly necessitate interpretation of the collective bargaining agreement"); *Davis v. Texprint (GA), Inc.*, 774 F. Supp. 638, 640 (M.D. Ga. 1991). Therefore, plaintiff's claims brought under state law are preempted.

**B.   Plaintiff's "Hybrid" Claim under Section 301 of the LMRA**

Where preemption applies, the Court may either recharacterize the claim as a Section 301 claim, or dismiss the claim as preempted. *Lueck*, 471 U.S. at 220. Because the parties' briefs appear to acknowledge that plaintiff's claims are at least cognizable under Section 301, the Court will treat plaintiff's claims as if they were brought under federal law. *Dunn v. Air Line Pilots Ass'n*, 836 F.

15

Supp. 1574, 1580 (S.D. Fla. 1993)(characterizing misrepresentation claim as breach of duty of fair representation).

Although plaintiff argues that he has properly raised a Section 301 claim, he disputes whether his lawsuit is properly understood as a mere breach of contract action under Section 301, or the more complex "hybrid claim."  Because "hybrid claims" are subject to distinct limitations and requirements, the Court must now decide which characterization is appropriate.

"Whe[n] an employee sues [his] employer for breach of [a] collective bargaining agreement and [sues] the union for breach of the union's duty of fair representation, the claims are known as hybrid §301/fair representation claims." *Shanks v. Potter*, No. 11-10426, 2011 WL 6004022, at *1 (11th Cir. Dec. 1, 2011); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983).  Plaintiff contends that he is not suing the Union for its breach of a duty of fair representation, but is instead basing his claim on the Union's obligations arising from the National Agreement and SAP.  (Pl.'s Resp. Br. [66] at 10-12.)  A study of plaintiff's allegations in support of Count IV against the Union, however, clearly shows that he is raising a "fair representation" claim against the Union, and thus a "hybrid claim" against the Union and General Motors.  (*Id.*)

Count IV alleges that the Union breached the National Agreement

16

by "fail[ing] to assert all defenses available to [plaintiff] during the grievance proceedings," being "entirely uncooperative in informing [plaintiff] of the status of his grievance proceedings, fail[ing] to involve [plaintiff] in any decisions during the grievance proceedings, and fail[ing] to respond to several attempts by [plaintiff] to contact [the Union] about information regarding his grievance proceedings." (Am. Compl. [17] at ¶¶ 42-43.) In so doing, the Union allegedly "acted arbitrarily, discriminatorily, and in bad faith." (*Id.* at ¶ 44.) Plaintiff further alleges that CBAs between General Motors and the Union imposed a "duty of care [on the Union] to act as his agent in protecting and asserting [plaintiff's] rights to employment under the collective bargaining agreement." (*Id.* at ¶ 45.) By assuming this "duty of care towards [plaintiff] through its execution of the collective bargaining agreement," the Union was allegedly "negligent in allowing [plaintiff] to be terminated from his employment without cause under the pretext of false allegations, by failing to assert all valid defenses on behalf of [plaintiff]," and by "failing to exhaust any and all legal recourse available to [plaintiff]." (*Id.* at ¶ 46.)

In sum, plaintiff is alleging that the Union acted "arbitrarily, discriminatorily, and in bad faith" during its handling of his grievance and overall representation before his employer. (*Id.* at ¶ 44.) These buzz words are the crux of a breach of the duty of fair

17

representation claim. *See Barrington v. Lockheed Martin, U.A.W. Local 788*, 257 Fed. App'x 153, 156 (11th Cir. 2007)("If the union representing the employee 'acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation,' an employee may sue both the employer and the union"). In his original complaint, plaintiff actually described his cause of action as "Local 10's Breach of Duty of Fair Representation." (Compl. [1] at Count IV.) His amended complaint drops this moniker, but relies on the same basic allegations of wrongdoing. Regardless of how plaintiff tries to label his claim, he is complaining that the Union breached its duty of fair representation.

Nonetheless, plaintiff persists in denying that he is bringing a claim for breach of a duty of fair representation, and instead characterizes Count IV as his attempt, as a third-party beneficiary, to enforce the National Agreement against the Union. (Pl.'s Resp. Br. [66] at 10.) In evaluating whether plaintiff may pursue a breach of contract action based on the terms of a CBA, plaintiff must demonstrate that the CBA "specifically indicat[es] an intent to create obligations enforceable against the union by the individual employees." *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 374 (1990).

18

Paragraph 53 of the National Agreement provides that "[n]o employee or former employee shall have any right under this Agreement in any claim, proceeding, action or otherwise on the basis, or by reason, of any claim that the Union or any Union officer or representative has acted or failed to act relative to presentation, prosecution or settlement of any grievance or other matters as to which the Union or any Union officer or representative has authority or discretion to act or not to act under the terms of this Agreement." (Nat'l Agmt. at ¶ 53, attached to Pl.'s Dep. [57].) This provision unequivocally expresses UAW and General Motors' intention <u>not</u> to create any sort of obligation enforceable by a third-party union member like plaintiff. *See Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1279 (11th Cir. 1982)("In construing any contract, including a [CBA], determining the intent of the parties is the essential inquiry."); *Alford v. General Motors Corp.*, 926 F.2d 528, 530-31 (6th Cir. 1991)(construing similarly worded language as prohibiting any direct action against employer for breach of contract).

Neither a provision obligating union representatives to behave professionally, nor an aspirational statement about adhering to the grievance process, can be read in context to "specifically indicat[e] an intent to create obligations enforceable against the union by the individual employee[]." *See Hester v. Int'l Union of Operating*

*Eng'gs*, 941 F.2d 1574, 1580 (11th Cir. 1991).   Therefore, plaintiff is not a third-party beneficiary of the National Agreement and Count IV is properly understood as a claim for the breach of the duty of fair representation.

Because Count IV clearly rests on the assertion that the Union breached its duty of fair representation and plaintiff also alleges that defendant General Motors breached the National Agreement, plaintiff is bringing a hybrid claim. *DelCostello*, 462 U.S. at 164-65.   Defendants move for summary judgment on the grounds that plaintiff's suit is barred by two doctrines governing hybrid claims: the statute of limitations and the exhaustion of internal remedies.

## III.  <u>STATUTE OF LIMITATIONS</u>

Defendants move for summary judgment on the ground that plaintiff's complaint is barred by the statute of limitations. (GM's Br. [53] at 9-11; Union's Br. [56] at 3-5.)   Hybrid claims are subject to a six-month statute of limitations. *Sams v. United Food & Commercial Workers Int'l Union*, 866 F.2d 1380-1382 (11th Cir. 1989).   A cause of action accrues under Section 301, and the statute of limitations begins to run, when in the "exercise of reasonable diligence the claimant knew or should have known of the injury." *Hill v. Ga. Pwr. Co.*, 786 F.2d 1071, 1074-75 (11th Cir. 1986).   The timeliness of the suit is measured "from the date on which the employee knew or should have known of the union's final action or the

20

date on which the employee knew or should have known of the employer's final action, *whichever occurs later.*"  *Id.* at 1075. (emphasis in original).  Final action means the point "where the grievance procedure was exhausted or otherwise broke down to the employee's disadvantage." *Id.* (citing *Proudfoot v. Seafarer's Int'l Union*, 779 F.2d 1558, 1559 (11th Cir. 1986)).  Finally, because a hybrid § 301 claim involves interdependent claims against an employer and its union, the Eleventh Circuit has noted that the separate causes of action (duty of fair representation and breach of contract) "accrue simultaneously" for statute of limitations purposes. *Id.* at 1074.

Defendants contend that the Union conducted its "final action" around September 24, 2008,[4] when a Union official orally notified plaintiff that it had settled his grievance and explained to plaintiff what the terms of that settlement were. (GM's Br. [53] at 9-11; Union Br. [56] at ¶¶ 8-9.)  Accordingly, with a six-month limitation period, the statute of limitations for a legal claim by plaintiff would have expired in late March, 2009.  Plaintiff filed

_____

[4]   The settlement was finalized between the Union and GM on September 24, 2008, after which Tony Lovely, a union official, notified plaintiff. *Supra*, at 9.  Lovely avers that the conversation with plaintiff took place sometime between September 24th and September 26th of 2008.  *Id.*  In any event, Lovely's notification would have been before October 1, 2008, as Lovely indicated that the latter would be the effective date for plaintiff's retirement. *Id.*

21

suit on June 15, 2010, some fifteen months past the statute of limitations deadline, under defendant's position.

Plaintiff disagrees that the Union's "final action" occurred in late September 2008, but instead asserts that the final action occurred on April 5, 2010, when the Union provided him with written documentation of the grievance settlement. (Resp. Br. [66] at 13-14.) If so, the statute of limitations would have started running on this latter date and would have expired around October 5, 2010, meaning that the plaintiff's present action, filed in June 2010, would have been timely.[5]

The Court concludes that the Union's action became final at the end of September 2008, when plaintiff's grievance was settled and he was so notified. The statute of limitations began to run when plaintiff "knew or should have known of the union's final action." *Proudfoot v. Seafarer's Int'l Union*, 779 F.2d 1558, 1559 (11th Cir. 1986). Written notice of a union's final action is not required, where the union verbally informs plaintiff of the disposition of his grievance. *Howard v. Lockheed-Georgia Co.*, 742 F.2d 612, 614 (11th Cir. 1984). In *Howard,* the Eleventh Circuit held that the fact that plaintiff did not receive formal written notice of the union's

---

[5]   Plaintiff also suggests that deadline for filing would have even been later than the above date, as plaintiff contends that the statute of limitations was tolled while internal union remedies were available to him. (*Id.*)

September 22 action until the Union later wrote plaintiff on October 28 was not determinative. Rather, the earlier date on which plaintiff was orally informed of his grievance withdrawal was the controlling date. *Accord Cannon v. Dyncorp.*, 462 F. Supp. 2d 1190, 1204-05 (M.D. Ala. 2005)(final action took place when union told plaintiff it was not going to file a grievance, and no further action was taken).

Plaintiff admits that he was notified of the settlement of his grievance in late September of 2008. At that time, he knew that he would receive retirement pay and knew that he would not receive the SAP lump sum bonus payment of $62,500 or back pay that would have been owing to him since the date of his firing on June 26, 2008 and up to the October 1, 2008 effective date of his retirement. Thereafter, consistent with the settlement agreement, plaintiff began receiving his retirement pay. Plaintiff has not explained why the absence of a written document confirming what plaintiff already knew and was acting on, as he was apparently cashing his retirement checks, was a barrier to his pursuit of either internal remedies or a lawsuit. Likewise, having now seen the written document, he has not explained what there was in that document of which he was not already aware in late September.

In short, with a start date of late September 2008, the statute of limitations would have expired in late March, 2009. As

23

plaintiff's complaint was not filed until June 15, 2010, which was well over a year after the statute of limitations had run, plaintiff's claim is therefore time-barred.

Plaintiff has also suggested that he would have been entitled to tolling for the time during which he could have gone through an appeal process to challenge the Union's acceptance of the settlement. Stated another way, plaintiff's position is that the Union's action was not deemed "final" until the time period for pursuing internal union remedies had ended.   Plaintiff never pursued any internal remedies, but the Court will assume that he is correct when he contends that the statute of limitations was tolled during the period of time that he had to appeal the Union's settlement decision.[6]

The Union Constitution allowed a sixty-day time period for an internal appeal, which would begin to "run from the time the appellant first becomes aware, or reasonably should have become aware, of the alleged action or decision appealed." (Union Const., Art. 33, §§ 4(b), (c), attached to Pl.'s Dep. [57].) As noted, the Court has already concluded that the plaintiff would have been aware

---

[6]   This assumption may not be warranted, however, as there is some case authority indicating that tolling can arise only when the employee actually pursues internal remedies. *See, e.g.*, *Dunleavy v. Local 1617*, 814 F.2d 1087, 1090-91 (6th Cir. 1987)("so long as a union member is engaged in a good faith attempt to exhaust his internal remedies..., the six-month period of limitations is tolled.").   At any rate, the Court need not decide this question.

of the decision to be appealed--the settlement decision--in late September 2008. Accordingly, plaintiff would have had sixty days, or until late December 2008, in which to have filed his internal appeal of the Union's decision to accept the settlement. That tolling only buys the plaintiff sixty days,[7] however, and his lawsuit was filed over a year late. Thus, even with tolling, the statute of limitations would have expired in late June 2009. Again, plaintiff's complaint was not filed until June 2010.

For all the above reasons, the Court **GRANTS** summary judgment to defendants, based on the expiration of the statute of limitations prior to the filing of plaintiff's present lawsuit.

## IV.  EXHAUSTION

Even if plaintiff's claim had been timely filed, summary judgment would still be appropriate because plaintiff failed to exhaust his internal union remedies. In order to pursue a Section 301 action, an employee is required to exhaust all contractual

---

[7]  Stated another way, the Union's action did not become final until the time to seek an internal appeal had passed, which would be sixty days after plaintiff knew that the grievance settled. *See Shivers v. IBEW Local Union 349*, 262 Fed. App'x 121 (11th Cir. 2008)(final union action occurred when union adversely ruled on employee's grievance and employee did not seek timely appeal of this decision within time frame set forth in Union Constitution); *Youngblood v. Potter*, 262 F. Supp. 2d 1309, 1315 (M.D. Ala. 2003)("Absent the filing of an appeal of the Step 1 decision, the [employer's] decision at Step 1 and the Union's actions in assisting with the Plaintiff's grievance became final actions on September 9, 2001, because the grievance was deemed to be waived.").

remedies. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). This exhaustion requirement also generally applies to internal union appeal procedures provided by a union constitution. *Clayton v. UAW*, 451 U.S. 679, 681 (1981). The undisputed facts show that plaintiff did not exhaust his available contractual remedies under the Union Constitution.

Article 32, Section 1 of the UAW Constitution permits a member to appeal "any action, decision or penalty by" a "Local Union, or any of its units, committees, officers, committee persons or stewards." (*See* Union Const., Art. 32, § 1.) The UAW Constitution offers four levels of internal appeals that must be exhausted before resorting to court action. (*Id.* at Art. 33, § 5.)[8] Plaintiff complains now about the actions of the local Union and its representatives, but he never filed an internal appeal, which would have been the appropriate vehicle to voice his objections. As such, he has failed to fully exhaust his remedies and his claims should be barred.

Plaintiff concedes that, generally speaking, an employee is required to exhaust administrative remedies before pursuing a suit against his union or employer. He argues, however, that the Court

---

[8] "It shall be the duty of any individual or body, if aggrieved by any action, decision or penalty imposed, to exhaust fully the individual or body's remedy and all appeals under this Constitution and the rules of this Union before going to a civil court or governmental agency for redress." *Id.*

26

should exercise its discretion to excuse the exhaustion requirement.[9]
*Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 329-30
(1969)(the exhaustion requirement is subject to exceptions when a
"doctrinaire application of the exhaustion rule would defeat the
overall purposes of federal labor relations policy.").  In deciding
whether to excuse a failure to exhaust internal union procedures,[10]
a court should consider at least three factors:

> first, whether union officials are so hostile to the employee
> that he could not hope to obtain a fair hearing on his claim;
> second, whether the internal union appeals procedures would be
> inadequate either to reactivate the employee's grievance or to
> award him the full relief he seeks under § 301; and third,
> whether exhaustion of internal procedures would unreasonably
> delay the employee's opportunity to obtain a judicial hearing on
> the merits of his claim.

---

[9]  As a prerequisite to excusing the exhaustion requirement, a
union member must actually attempt to utilize the internal process.
*Jimenez v. Collier Transit Mgmt., Inc.*, 337 Fed. App'x 804, 808 (11th
Cir. 2009)("To claim futility, the employee may not simply *assert*
that his use of the grievance procedures would have been futile: he
must ordinarily at least have *attempted* to use them.")(emphasis in
original).  While plaintiff did not fully complete the grievance
appeal process, he did file a grievance.

[10]  Exhaustion is also excused if the employer repudiates the
grievance machinery or the union wrongfully refuses to process a
grievance.  *Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1052-53
(11th Cir. 1996)("Employees can avail themselves of remedies in
federal court without exhausting administrative remedies if their
employer repudiates the grievance machinery or the union wrongfully
refuses to process a grievance.").  Plaintiff does not appear to rely
directly on these exceptions to the exhaustion requirement, nor do
they appear to be applicable.  *See Rabalais v. Dresser Indus., Inc.*,
566 F.2d 518, 520 (5th Cir. 1978)("An employer can obviously take a
stance contrary to that of the employee during the grievance process
without being deemed to have repudiated that process.")

27

*Radar v. United Transp. Union*, 718 F.2d 1012, 1014 (11th Cir. 1983)(citing *Clayton*, 451 U.S. at 689).  Plaintiff argues that the Court should excuse his failure to seek administrative remedies because he would likely have lost an internal appeal of the settlement agreement and because pursuing these internal remedies would have unreasonably delayed plaintiff's opportunity to obtain a judicial hearing on the merits of the instant claim.

Neither argument is persuasive.  The internal union appeals process would have clearly permitted plaintiff to challenge the Union's decision to settle, and if successful, plaintiff could have obtained monetary relief akin to what he now seeks in the present action.[11]  Article 33 of the UAW Constitution provides four levels of appeal for "any action, decision or penalty by" a "Local Union." (Union Const., Art. 33, § 1.)  The first level of appeal would have been to the UAW Local 10 membership, and then to the UAW, and then to the International Executive Board, and finally to the Convention Appeals Committee or where appropriate the Public Review Board.  (*See*

───────────────

[11]   In addition, to back pay and the SAP lump sum bonus, plaintiff also seeks punitive damages and attorney's fees.  Punitive damages are not available in a Section 301 breach of the duty of fair representation claims.  *See Leach v. Pan Am. World Airways*, 842 F.2d 285, 288 (11th Cir. 1988), *disapproved on other grounds* in *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 563 n.2 (1990).  Whether internal union remedies would have provided for such damages is thus irrelevant.

28

Union Const., Art. 33, § 2(a).)[12]   The Public Review Board and Convention Appeals Committee are authorized to order UAW or its Locals to pay money damages to an aggrieved member and order the processing of a grievance that was wrongfully disposed of.  (Stokes-Wilson Aff. [56] at ¶¶ 12-14, Ex. 3.)  The adequacy of the Union's internal remedies undermines plaintiff's request that he be excused from exhausting these remedies.  *Compare Barrington v. Lockheed Martin*, 483 F. Supp. 2d 1154, 1164-65 (M.D. Fla. 2007)(excusing failure to exhaust internal appeals where CBA would not permit Union to give plaintiff complete relief she sought: assignment of a new union representative, reopening of arbitration, and designation of a new arbitrator).

Further, exhaustion of internal procedures would not have unreasonably delayed plaintiff's opportunity to obtain a judicial hearing on the merits of his claim.  Because plaintiff waited almost 21 months to file this lawsuit, he can hardly complain now about any delay that an internal appeals process might have created.  *Oliver v. Local No. 1261 United Transp. Union*, 587 F. Supp. 3 (N.D. Ga.

---

[12]   "In any challenge to the handling or disposition of a grievance: Where the challenge is against a Local Union committeeperson, steward, Bargaining Committee, officer or other Local Union official the levels of appeal are first to the unit of an Amalgamated Local Union, then to the Union; then to the International Executive Board and then to the Convention Appeals Committee, or where appropriate the Public Review Board."

29

1984)(exhaustion required where no evidence of unreasonable delay, given that plaintiff waited nearly two years after learning that grievance would not be pursued before filing suit).

In a further attempt to evade the exhaustion requirement, plaintiff argues that exhaustion is not required because proceeding with administrative remedies would have been "wholly futile." *See Glover*, 393 U.S. at 330; *Pyles*, 79 F.3d at 1053 (recognizing an exception to the exhaustion requirement when proceeding with administrative remedies would have been "wholly futile."). Plaintiff argues futility based on his union representative's opinion that any further appeal would be unsuccessful. (Resp. Br. [59] at 23.)

The pessimism of his union representative, however, does not excuse plaintiff from trying to undo the settlement by utilizing procedures set up for that very objective. *See Ryan v. General Motors Corp.*, 929 F.2d 1105, 1110 (6th Cir. 1989)("It is well-settled that the opinion of a union representative cannot be construed as a waiver of the UAW's constitutional appeal requirements."). The test for futility is not whether an employee's claims would have succeeded, but whether the employee could have availed himself of the grievance procedure. *Mason v. Cont'l Grp., Inc.*, 763 F.2d 1219, 1224 (11th Cir. 1985).

Plaintiff also contends that, without a written confirmation of the terms of the settlement, he could not have proceeded with an

30

appeal within the designated 60-day time limit.  (Resp. Br. [59] at 18-19.)  Article 33, Section 4 of the UAW Constitution, however, only requires plaintiff to bring any appeal within 60 days "from the time he first became aware, or reasonably should have become aware, of the alleged action or decision appealed."  (Union Const., Art. 33, § 4.) There is no requirement of a written document.  Again, plaintiff was well aware of the terms of the settlement.  That is, plaintiff accepted his retirement benefits, which would have been denied to him had there not been a settlement.  He chose to accept the positive parts of that settlement--the retirement benefits--but, with this lawsuit, he now seeks to renege on his implicit quid pro quo: relinquishment of the SAP bonus and back pay.

Finally, plaintiff argues that exhaustion is excused because the Union acted discriminatorily, dishonestly, and in an arbitrary or perfunctory fashion.  *DelCostello*, 462 U.S. at 164 (when a union acts in a "discriminatory, dishonest, arbitrary, or perfunctory fashion" that is sufficient to breach its duty of fair representation, an employee may bring suit against the employer and the union, notwithstanding what would otherwise be a final grievance proceeding.).  Whether the Union behaved in this fashion also bears on whether it has breached the duty of fair representation.  *See Vaca v. Sipes*, 386 U.S. 171, 190 (1967)(a breach of the statutory duty of fair representation occurs only when a union's conduct toward a

31

member is arbitrary, discriminatory, or in bad faith.).  For the reasons explained below, plaintiff has failed to demonstrate that the Union behaved in a discriminatory, dishonest, or arbitrary fashion. As such, summary judgment is appropriate.

**V.    THE UNION'S DUTY OF FAIR REPRESENTATION**

In evaluating a union's performance of its duty of fair representation, the Eleventh Circuit has stated that:

> a union is allowed considerable latitude in its representation of employees. The grievance and arbitration process is not conducted in a judicial forum and union representatives are not held to strict standards of trial advocacy.  Cases are uniform in holding that neither negligence on the part of the union nor a mistake in judgment is sufficient to support a claim that the union acted in an arbitrary and perfunctory manner.  The union is accorded a "wide range of reasonableness" in the exercise of its discretion, and although it is circumscribed by a duty to act with "complete good faith and honesty of purpose," the employee's burden "remain(s) a substantial one." Nothing less than a demonstration that the union acted with reckless disregard for the employee's rights or was grossly deficient in its conduct will suffice to establish such a claim.

*Harris v. Schwerman Trucking Co.*, 668 F.2d 1204, 1206-07 (11th Cir. 1982)(citations omitted).  *See Turner v. Air Transp. Dispatchers' Ass'n*, 468 F.2d 297, 300 (5th Cir. 1972)("A union's broad discretion in prosecuting grievance complaints includes not only the right to settle the dispute short of arbitration but also to refuse to initiate the first steps in the appeal procedure when it believes the

grievance to be without merit.")[13]; *Barrington*, 257 Fed. App'x at 156.
*Taaffe v. Bellsouth Telecomms., Inc.*, 204 Fed App'x 823, 825 (11th
Cir. 2006)("The issue is not whether the union's interpretation of
the facts and contract language was correct, but whether it was
arbitrary.").

Plaintiff argues that the Union failed to adequately represent
him before, during, and after his 76(a) interview with General
Motors' management.  First, plaintiff argues that Willis failed to
adequately prepare him <u>before</u> his interview, which prevented him from
offering an explanation for his lengthy lunch breaks.  (Pl.'s Resp.
Br. [59] at 20.)  Next, he argues that Willis failed to adequately
represent him <u>during</u> his interview because Willis did not assert
available defenses and failed to investigate the circumstances
surrounding plaintiff's termination.  (Pl.'s Resp. Br. [59] at 20.)
Plaintiff also argues that the Union failed to adequately represent
him <u>after</u> his termination because the Union settled his case quickly,
due to Willis' impending retirement; was uncooperative in informing
him of the status of his grievance proceedings; failed to respond to
several attempts by plaintiff to contact the Union about information
regarding his grievance proceedings; never consulted with plaintiff

---

[13]    Decisions of the former Fifth Circuit rendered prior to
October 1, 1981, are binding precedent in the Eleventh Circuit.
*Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en
banc).

33

prior to settling; never appealed his decision despite his termination being a "major case;" and never provided him with documentation of the settlement agreement, which prevented him from knowledgeably appealing internally within the union. (Pl.'s Resp. Br. [59] at 20-21.)

Plaintiff's assertions do not imply that the Union acted arbitrarily or in bad faith prior to the 76(a) interview. Plaintiff cites no authority for the proposition that a union representative must ascertain detailed facts about an employee's situation prior to a disciplinary interview with an employer. Here, both plaintiff and Willis became aware of the allegations shortly before the interview. Willis learned the basic charges from General Motors, met with plaintiff, and told him how to conduct himself. (Willis Dep. [63] 30-35.) Under the circumstances, this representation was not arbitrary or in bad faith.

The Union also did not act arbitrarily or in bad faith during the 76(a) interview. Willis made objections on plaintiff's behalf and questioned him in an effort to develop the evidence. (Pl.'s Dep. [57] at 120-121.) Plaintiff even agreed that Willis tried to protect him during the interview. (*Id.* at 121.) Moreover, Willis' instruction to plaintiff that he should only answer the questions asked of him, without elaboration, which plaintiff argues prevented him from explaining his lengthy lunch breaks, was an arguably

34

reasonable strategy to prevent plaintiff from opening himself up to further discipline.  *See Barrington*, 257 Fed. App'x at 156-57 (union representative's determination that employee should not testify is "reasonable strategy" to prevent opening door to other issues).

The Union's behavior after plaintiff's termination was also not discriminatory, arbitrary, or in bad faith.  Willis followed through with his obligation to investigate and determine the merits of plaintiff's grievance.  *Turner*, 468 F.2d at 299 ("the duty of fair representation includes an obligation to investigate and to ascertain the merit of employee grievances").  Willis fulfilled his obligations by determining whether Zefo's testimony that she personally viewed someone other than plaintiff swiping his card was credible.  There is no evidence that Willis acted in a "perfunctory" fashion by shuttling plaintiff's claim through the grievance process without any concern for its resolution.  *See Massey v. United Transp. Union*, 868 F. Supp. 1385, 1394 (S.D. Ga. 1994)("To show that the union acted in a 'perfunctory' fashion, merely shuttling an employee's claim through the grievance process with no concern for its resolution, [plaintiff] must demonstrate 'that the union ignored the grievance, inexplicably failed to take some required step, or gave the grievance merely cursory attention.'").

The Union also provided plaintiff with adequate details of his settlement, even though it was not in written form.  *Russell v.*

35

*Norandal USA, Inc.*, No. CV92-PT-1490-M, 1993 WL 388638, at *7 (N.D. Ala. May 17, 1993)(mere failure to provide an employee with a copy of a grievance does not constitute a violation of a Union's duty of fair representation); *Rasheed v. Int'l Paper Co.*, 826 F. Supp. 1377, 1388 (S.D. Ala. 1993)(union's delay in providing employee with information about his grievance, after it had already been litigated before the arbitrator, could not "conceivably amount to a breach of the Union's duty of fair representation").

As for the actual settlement decision, "[a] union's broad discretion in prosecuting grievance complaints includes not only the right to settle the dispute short of arbitration but also to refuse to initiate the first steps in the appeal procedure when it believes the grievance to be without merit." See *Turner*, 468 F.2d at 300. Further, a duty of representation "does not confer an absolute right on an employee to have his complaint carried through all stages of the grievance procedure". *Id.* at 299.

Willis met with management on numerous occasions in an effort to obtain a settlement for plaintiff. Willis' belief that there was sufficient evidence supporting the charges against plaintiff and that any further appeal would likely result in plaintiff losing a substantial benefit of the settlement that Willis was able to negotiate--a retention of plaintiff's pension, health, and life insurance benefits--was not "so far outside a 'wide range of

36

reasonableness' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)(citation omitted).  At worst, the Union's behavior would have been negligent, and "mere negligence...would not state a claim for breach of the duty of fair representation." *Rawson*, 495 U.S. at 372-73; *Papavaritis v. Comm'cn Workers of Am.*, 772 F. Supp. 604, 607 (S.D. Fla. 1991)("mere fact that union was ineffective or did not zealously prosecute the plaintiff's claim is insufficient, without more, to support a fair representation claim").  The settlement decision did not breach the duty of fair representation.

For the above reasons, plaintiff has not demonstrated the existence of a genuine issue of material fact with respect to the adequacy of the Union's representation of plaintiff.  That is, there is no evidence that the Union's behavior was arbitrary, discriminatory, or in bad faith.  Accordingly, summary judgment is also warranted on the merits of plaintiff's breach of the duty of fair representation claim.  Both defendants' motions for summary judgment should be **GRANTED** on the grounds that plaintiff failed to exhaust internal remedies.  The Union's Motion for Summary Judgment is also due to be **GRANTED** on the merits.

## VI.   DEFENDANT GENERAL MOTORS' ALLEGED BREACH OF CONTRACT

To prevail on a hybrid claim, a plaintiff must demonstrate both that the CBA was breached and that the union breached its duty of

fair representation.  *Aldred v. Avis Rent-A-Car*, 247 Fed. App'x 167, 171 (11th Cir. 2007).  Thus, the failure of plaintiff's duty of fair representation claim dooms his breach of contract action against defendant General Motors.  *UPS, Inc. v. Mitchell*, 451 U.S. 56, 62 (1981)(duty of fair representation claim is "indispensable predicate" for hybrid claim).  Defendant General Motors' Motion for Summary Judgment [53] should also be **GRANTED** on the merits.

## CONCLUSION

For the foregoing reasons, defendant General Motors' Motion for Summary Judgment [53] is **GRANTED** and the Union's Motion for Summary Judgment [56] is **GRANTED**.  The clerk is directed to close the case.


SO ORDERED, this 23rd day of March, 2012.



/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)